UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       **Plaintiff**,                      Case No. **19-20216 -01**

vs.                              HON. **VICTORIA A. ROBERTS**
                                        **United States District Judge**

D-1   JAMILIE LEDESMA,

       **Defendant**.
_____/

### *DEFENDANT'S SENTENCING MEMORANDUM*

Jamilie Ledesma is awaiting sentence before this Honorable Court pursuant to a Rule 11 Pea Agreement, wherein Mr. Ledesma pled guilty to Count 1 of the Third Superseding Information, Conspiracy to Distribute at least 500 grams of Cocaine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1).

As this Court is acutely aware, the Court is required to impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C §3553. Thus, the Court must consider the factors set forth in §3553(a). The Sentencing Guidelines are simply the starting point in the Court's determination of a defendant's sentence.

"[T]he sentencing court must first calculate the Guideline range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors," *Nelson v. United States,* 555 U.S. 350, 351 (2009).

"The guidelines are not only not mandatory on sentencing courts they are also not to be presumed reasonable." *Id*. at 352; *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States,* 552 U.S. 85 (2007). The guidelines are an "initial benchmark" or "starting point, "*Gall* at 49, but there is no "thumb on the scale for the guideline range." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007). In determining a sentence, the sentencing court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall* at 52.

## II.    SENTENCING FACTORS PURSUANT TO 18 U.S.C. §3553(a)

This Honorable Court is obviously well versed in the Supreme Court's ruling in *United States v. Booker,* 543 U.S. 220; 125 S. Ct. 757 (2005), which made the guidelines effectively advisory," and "requires a sentencing court to tailor the sentence in light of other statutory concerns…see §3553(a)  (Supp. 2004)". After *Booker*, the Guidelines are to be "respectfully considered", but no one factor is to be given more or less weight than any other §3553(a) factor to be taken into account in arriving at an appropriate sentence. *Kimbrough, supra; Rita, supra.*

Previously disapproved or disfavored departure factors such as physical condition (U.S.S.G. §5H1.4) employment record (U.S.S.G. §5H1.5); family ties

2

and responsibilities (U.S.S.G. §5H1.6); socio-economic status (U.S.S.G. §5H1.10); and substance abuse (U.S.S.G. §5H1.4) may now be considered. Post *Booker*, there is no limitation on the information concerning the background, character and conduct of a defendant which a court may receive and consider for the purposes of imposing an appropriate sentence. 18 U.S.C. §3661.

The United States Code is quite explicit about the role of 18 U.S.C. §3553(a) in sentencing determinations. 18 U.S.C. §3582 specifically states:

> The court, in determining whether to impose a term of imprisonment and, if a term of imprisonment is to be imposed in determining the length of this term, <u>shall consider</u> the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation. (Emphasis added).

The District Court can also make independent assessments to justify an individualized sentence determination. In *Rita, supra*, the Supreme Court held that the district courts can conclude that the guideline sentence fails to reflect 18 U.S.C. §3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate "regardless."

> <u>Booker</u> breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the §3553(a) factors to the criminal defendants that come before them. If there is a pattern that emerges from *Rita, Gall* and *Kimbrough*, it is that the district court judges were vindicated in all three cases, and a court of appeals was affirmed just once and that of course was when it

3

deferred to the on-the-scene judgment of the district court. *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir.) (en banc), *cert. denied,* 129 S. Ct. 67 (2008).

Variances are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some aspects, the rigidity of the Guidelines themselves. Many courts have held that district judges need not shrink from utilizing variances/downward departures when the opportunity presents itself and when the circumstances require such action to bring about a fair and reasonable sentence. However, what it should be is an act of reason by the Judge looking at a particular person and the circumstances of the crime that this person has committed and then making a judgment. *United States v. Dominquez.* 296 F.3d 192, 196 n.7 (3rd Cir. 2002). ("The Guidelines do not require a judge to leave compassion and common sense at the door to a courtroom"); *United States v. Meyers*, 353 F. Supp. 2d 1026, 2017 (S.D. Iowa 2005); *United States v. Biheiri,* 356 F. Supp. 2d 589 (E.D. Va. 2005) ("fashioning a just sentence cannot be reduced to a mere arithmetical exercise and that reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produce an illusory precision that obscures the fact <u>that sentencing in the end, must involve the exercise of judgment".)</u> (Emphases added).

### A/B.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE PURSUANT TO 18 U.S.C. § 3553(a) HISTORY AND CHARACTERISTICS OF DEFENDANT

As the Court is aware from reading the PSR, Mr. Ledesma has been involved with the Criminal Justice System since the age of 18. Dating back to May 2000, when he was charged with fleeing and eluding. As the Court may be aware by reading the PSR and receiving a letter from the Defendant. He had a long and difficult childhood. This writer is not going to recount with this Honorable Court what she has heard innumerable times over the years that you have been on the bench: all of the reasons why African Americans and people of color are in the criminal justice system. Mr. Ledesma is a perfect example of these disparities and also of the consequences of growing up in poverty, not having parents in his life and ultimately taking up a life of crime at an early age. Having said that, I do not believe it is a good use of, the Court's time nor this writer's time by reiterating all the studies that suggest why people of color find themselves in the criminal justice system, much more than others.

However, the Defendant would be remiss if counsel herein didn't comment on the disparities of Racial Factors in the Legal System that Affect Incarceration. This writer wishes to point out to this Honorable Court the broad scale use of incarceration ostensibly as a means of crime control is largely a phenomenon of the 21st century. The progression of imprisonment of African-Americans has reached dramatic proportions. Projections by the Department of Justice show that if current trends continue, a black male born today has a one in a three chance (32.2%) of

spending time in state or federal prison in his lifetime. As a matter of policy, there is a recent recognition that severe criminal justice sanctions as a method of control of crime, has clearly been out of proportion to its beneficial effects. In addition to the limited benefits of the effects of severe sentences as a deterrent to crime, there is an even greater gap in addressing issues relating to the dramatic racial disparities that pervade the criminal justice system. Alfred Bloomstein, On the Racial Disproportionality of United States Prison Populations, 73 J. Crim. L. and Criminology 1259, 1280 (1982); Alfred Bloomstein, On the Racial Disproportionality of United States Prison Populations Revisited, 64 U.Colo.L.Rev.743, 751 (1993), concluded that due to the racially skewed nature of drug law enforcement, only fifty percent of the racial proportionality for drug incarceration was explained by differential arrest raids.

While crime rates explain some degree of variation by race, it is also clear that racism within the Criminal Justice System, whether conscious or not, contributes to disproportionate incarceration. This is not to suggest that the demonstrable changes within the Criminal Justice System in recent decades has not been of significance. Indeed, the greater diversity of leadership within the systems, the growing attention to issues of racial disparity, and changes in political discourse on race are all welcome developments. Nevertheless, a wealth of scholarship and experience documents that unwarranted racial disparities persisted

at every level of criminal justice decision –making, albeit in more subtle ways than in previous eras. Among drug offenders sentenced to prison, fifty-three percent are African-American. While this figure arguably may incorporate factors such as higher levels of involvement in the drug trade or more substantial criminal history; scholars such as Michael Tonry have concluded that "although disadvantaged young people of all races and ethnicities have been affected by the drug wars, the greatest attention has been on Hispanics and Blacks and as a result the war on drugs, foreseeably and unnecessarily , blighted the lives of hundreds of thousands of young disadvantaged Black Americans and undermined decades of effort to improve the life chances of members of the urban black underclass."

Economic status also has a racial component to it, and directly impacts opportunities, particularly for African-Americans. Black poverty is different than poverty in general. African-Americans who are poor or low income are far more likely than whites to live in communities of concentrated poverty and disadvantages. Because of the confluence of racism in segregated housing patterns that persist to this day, low income Blacks are far more likely to live in neighborhoods that are segregated both by race and class. As a result, the disadvantages that accrue from poverty are magnified as well. These include limits on job opportunities and social linkages that develop through informal networks

among residents of the communities with access to resources. They also increase the likelihood of being in areas that proliferate, drugs and violence.

As part of a possible sea change in the legal system that recognizes both the overuse of incarceration and it disproportionate impact on minorities and poor, in December 2018 Congress passed the First Step Act, and this measure was signed into law by the President of the United States shortly thereafter. While some critics of the Act believe that it does not address all of the draconian sentencing provisions for non-violent offenses, (something which has been moderately addressed in the past presidential administration with the provision that was termed, in colloquial legal terms, as (the "Holder" provisions), it is exactly what it states – a first step. This is consistent with the momentum in federal and some state systems which have sought to recognize the need to be more flexible in the determination of what is an appropriate sentence, instead of being bound to more simplistic mandatory minimums in the application of sentencing policy. This is particularly important when one recognizes the disproportionate impact, historically and in the present day that unnecessarily punitive sentencing policy has had on black, poor, and non-white offenders.

Even the sentencing commission, in its own longitudinal assessment as far back as 2004, recognized the significance of race and poverty as factors that produced disproportionately deleterious impact on black and poor offenders. See,

U.S.S.C., Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform at page 133-134 (2004). In addressing these issues, the commission observed that black offenders, who are disproportionately sentenced under the career offender guideline, were subject to it largely based on drug trafficking crimes, and because of "the relative ease of detecting and prosecuting offenses that take place in open air drug markets, which are most often found in impoverished minority neighborhoods." The commission stated that what now seems obvious, that "African Americans have a higher risk of conviction for a drug trafficking crime than due similar white drug traffickers."

It is this writer's belief that the sentencing guidelines overstate the seriousness of the Defendants' involvement in the offense committed by Mr. Ledesma. The disparate impact of a guideline sentence warrants the imposition of a below guideline sentence. A sentence of 96 months is sufficient considering the facts of this case.

Mr. Ledesma has spent more than three years in custody in this case. Due to no fault of Mr. Ledesma, the length of pretrial detention, convictions and conditions of confinement have already been more punitive and restrictive than they would have been at any other time. Because of the limits brought upon the institutions by the covid-19 lockdown and the resulting restrictions that will

continue for an indefinite period of time. His conditions of confinement will continue to be more punitive and restrictive than are necessary. Considering the principle of incremental punishment, a below sentence guideline would still exonerate the principal of appropriate punishment and honor the overarching mandate for the sentence to be "sufficient, but not greater than necessary" to accomplish the goals of 18 U.S.C. § 355(a).

If that isn't enough, Mr. Ledesma has spent more than a year in solitary confinement because of activities that went on in the prison. How does one calculate what impact this has on a human being's life; to find himself dealing with one of the most devastating of diseases in our lifetime. And find himself contract covid at least twice while in prison and every day dealing with the possibility of contacting or contracting the virus again.

This is one of a number of reasons why a downward departure or a variance should apply. There is no dispute that there was a drug organization selling drugs in the metropolitan Detroit area. The Government attempts to divide this conspiracy into two separate groups. It's quite apparent that it uses different dates for different individuals. It goes without saying that Mr. Ledesma was incarcerated until September 2016. It is quite clear from the discovery materials that Mr. Ledesma was not involved in the conspiracy in 2016. The Government wants to separate the Wood/Ponce Ledesma conspiracy starting with the date of October

10

2016; and then wants to add Defendant Jamilie Ledesma starting with March 2017. It goes without saying that there is an ongoing conspiracy between the drug trafficking organization, which Mr. Ledesma was not a part of and was not involved in until March 2017.

Reviewing the discovery materials, it is this writer's position that Mr. Ledesma does not appear until there's a video in 2017, and that by June 2017, he is no longer involved in the conspiracy. It has been this writer's position and I've expressed to the Government that Mr. Ledesma was involved in this conspiracy for 90 to 120 days and no further.

The Government throughout the discovery misidentifies Mr. Ledesma and telephone numbers attributed to him, that they allege are his. The Government may or may not concur with this observation but the discovery is replete with wrong names and wrong telephone numbers having been attributed to Mr. Jamilie Ledesma.  It is this writer's position and the Government may very well dispute this position, the Defendant was involved in 21 phone calls lasting for a total of 9 minutes, 7 seconds. The old adage that "all black people look alike" is certainly apparent in this investigation. Except now the assumption is that "all Latino people look alike" therefore if you see one, you see the other.

This writer has continued to communicate to the Government for the last three years, since this indictment was returned. That this was not Mr. Ledesma's

11

deal. He communicated this repeatedly to counsel herein. This was someone else's drug conspiracy. He got "caught up" in it, because of the people he knew. The friendships that he had and being around people who were involved in the conspiracy. However, Mr. Ledesma has accepted the position and he pled guilty to being a part of the conspiracy, with a mandatory minimum of five years. Once agreeing to the five years, then the games began. What could have been the guideline range of 84 to 105 months with a Criminal History of IV, has now ballooned to almost double the number, because we agreed and the Government concurs that he was not to receive more then 2-points for Leadership Role. The Probation department has decided to attribute 3-points enhancement to the Defendant and livelihood enhancement which the Defendant objects and would direct the Court to the Defendant objections provided to the Court.

Please allow this writer to take a moment to express a few issues with some of the statements made in the Governments Sentencing Memorandum. The Government makes reference to Mr. Ledesma having conversations with Mr. Woods, and subsequently a courier would deliver drugs to Mr. Woods. It is no doubt and everyone knows from the beginning, at least I did, that Gomez Medina was working with the Government. The Government relied on its information of what Mr. Medina says. It also goes without saying that, Gomez Medina was working with the Woods long before Mr. Ledesma got involved and there is

12

nothing in this record to suggest that he provided payments to a courier for a Mexican Cartel. I assume they are referring to Uriel Galvan-Maciel, as being the courier. At the time that Uriel Galvan-Maciel was arrested he was not with Mr. Ledesma and when they went to a home where Mr. Ledesma was living, the only thing they found were cellular phones. No money, no drugs, no weapons.

Please allow this writer to express to this Honorable Court the distinction of the two dates for the so-called Woods conspiracy and the so called Ponce/Ledesma conspiracy. Woods dating back to October 2016 and the Ponce/Ledesma started in March 2017. That is patently untrue. The Government is well aware that these organizations were in contact with each other dating back to 2016, and my client had just been released from prison. He had two jobs. A tow-truck driver, it is pointed out in the objections and involved in a dumpster business. It may also be noted, that on the day that Mr. Ledesma was arrested, he was delivering or picking up a dumpster from a business in which he was conducting business with.

The defendant was certain that the Government saw Latino individuals at the stash house on 14th Street in Ecorse in early 2016, but it was not Jamilie Ledesma. This misidentification and attribution of telephone calls to the Defendant, which were not his, is throughout the discovery. However, it is also true that he appeared at the stash house in March 2017 – June 2017, and for that reason the Defendant plead to a mandatory five years in prison.

This writer would like to point out to this Honorable Court, an example of how things have been misconstrued in this Indictment. I direct the Court to page 19 of the PSR, where it refers to Adjustment to Supervision – in that Paragraph the Probation Officer suggests that Mr. Ledesma was found at a home where a fake I.D. was in fact discovered along with other illegal items, which is clearly untrue. If the Court would move to page 13 of PSR where it refers to 5150 Scotten Avenue, in that paragraph they state that Jamilie Ledesma's brother, Jhamin Ledesma was present during the search and the agents seized a fraudulent driver's license and identification for Mr. Ledesma and suggests that his brother says that, they were Jamilie Ledesma. This writer has yet to have reviewed the identification and at the Hearing for Termination of Supervised Release, the Defendant took the position that, it was not his identification and that he was not involved. Notwithstanding, it is completely false to attribute this to Mr. Ledesma being at any house with fraudulent identification that was discovered. Yet the Probation Officer and the Government suggests that occurred and, it just did not. Just as the Government discusses another alleged stash house where guns, monies and drugs were found and the only connection to Jamilie Ledesma is that one of the Defendants who, was later dismissed from this case, Tacora Jackson says that, she grew up and knew Mr. Ledesma from the neighborhood. That is not enough to make Mr. Ledesma a part of what went on at those particular stash houses. It is not

14

this writer's intent to litigate this case in this sentencing memorandum, but merely to point out some of the inconsistencies and the downright misinformation that the Government relied upon and transmitted to this Court.

Words cannot express my frustration and anger the Defendant has felt knowing that he has been put into this major drug conspiracy and having to face a draconian sentence for something where people have been misidentified and placed him in situations that were not necessarily him. Now he faces a Probation department and a sentence which requires a sentence twice of what his guidelines should have been, if he was not deemed to be a leader. If he was not enhanced 2-points for a Livelihood and if he was not placed in Category V Criminal history based on a conviction that occurred more than 20 years ago.

Again, the Defendant recognizes his criminal history and the fact that he is 41 years of age and has spent more than a third of his life in prison. He's had enough of being incarcerated and with a prospect of spending another 10 or more years in prison, at which he will be well over 50 years of age. He indicates it is time for him to find a way to become a productive citizen; a father to his 5 children with whom he has a good relationship with and, to become a law abiding citizen. I am sure when the Court hears that, it says rhetorically, Mr. Morgan he has been involved with criminal activity all of his life, and I would respond, Your Honor,

everyone sees the light and Mr. Ledesma has surely seen the light. He is ready to put himself on the proper path and to begin to change his life.

### C.    THE NEED FOR THE SENTENCE IMPOSED PURSUANT TO 18 U.S.C. §3553(a)(2)(A)-(D)

Mr. Ledesma understands and takes no issue with the fact that there are consequences for bad choices. He fully understands that the Court must impose a sentence that reflects the seriousness of his offense and to promote respect for the law. Mr. Ledesma has taken responsibility for his actions. This is evidenced by his admission of guilt and acceptance of responsibility for his actions. The sentence of the Court will certainly achieve the objectives of this sentencing factor.

### 1.    <u>Seriousness of the Offense, Respect for the Law and Just Punishment</u>

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment.

In *United States v. Bannister*, 786 F. Supp. 2d. 617 (E.D.N.Y 2011), the Court addressed the length of the prison sentences in the United States:

> The increased prison population is due in large part to longer sentences. For the same crimes, American prisoners receive sentences twice as long as English prisoners, three times as long as Canadian prisoners, four times as long as Swedish

16

prisoners. Yet these countries' rates of violent crime are lower than ours, and their rates of property crime are comparable.

U.S. Sentencing Commission: Over 65% of Federal Prisoners are Black or Hispanic (May 21, 2021)

The majority of people held in federal prisons are Black or Hispanic, according to the U.S. Sentencing Commission. About 34.9 percent of people detained by the Bureau of Prisons are Black; and 31.6 percent are Hispanic. The average age of federal prisoners as of March 2021 was 41 years. Offering a snapshot of the current state of the drug war, the data showed nearly half of the federal offenders were incarcerated for drug trafficking offenses.

## 2.    **Deterrence to Criminal Conduct**

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." There is no evidence that increases in sentence length reduces crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion as has every major survey of the evidence." Michael Ronry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

The Defendant stands before this Honorable Court today facing guidelines depending on who the Court believes. It is this writer's belief that the Defendants' guideline range is 87 to 96 months; and the Probation Department recommends a guideline range of 151 to 188 months and the Government recommends a guideline range of 168 to 210 months, both using a Criminal History of V, as

17

opposed to IV, which is what the Defendant believed at the time that he took the Plea. Notwithstanding what his understanding maybe. This writer has urged this Honorable Court to impose a downward departure on the criminal guideline history and deem that he is a Category IV instead of a V, because the sentence they refer to is more than 20 years old and he was sentenced on the same day for them. (*see the objections as it relates to that)*. Given that position, if in fact the Defendant is a Category IV as opposed to a Category V, and if the Court sustains the Defendants' Objections, it is this writer's belief that the Defendants' guideline range would be a Category IV as opposed to a Category V and a guideline range would be 110 to 137 months. This writer believes that a guideline sentence of 96 months, is sufficient, but not great than necessary, to comport with the purposes of 18 U.S.C. §3553(a).

The Government argues that a guideline sentence much above the mandatory 60 months is applicable. This writer disagrees and believes that the sentence that it has suggested to the court best fits Mr. Ledesma's involvement in this matter and should be 96 months, and such a sentence would be sufficient, but not greater than necessary.

The Defendant has pled to and will continue to abide by the Rule 11 Plea Agreement as it relates to the Obstruction of Justice charge. As the Probation Department has chosen not to apply this enhancement, this is something that this

Honorable Court will have to decide. The Defendant will abide by the agreement that he made with the Government and will not object to the enhancement pursuant to the agreement.

## <u>CONCLUSION</u>

For the foregoing reasons set forth above the Defendant request and beg this Honorable Court to sentence the Defendant to 96 months, and such a sentence is, sufficient but not greater than necessary to comply with the purpose of Section 3553(a).

Respectfully submitted,

/s/ Richard H. Morgan, Jr.
Richard H. Morgan, Jr.
485 Orchard Lake Road, Ste. 203
Pontiac, Michigan 48341
(248) 334-8970
Email: rhm_jr@msn.com
Bar No. P23924

Dated: October 18, 2022

## <u>*CERTIFICATE OF SERVICE*</u>

I hereby certify that on October 18, 2022, I served via email the foregoing Defendants' Sentencing Memorandum, with the Clerk of the Court using the Court's ECF system, which will send notification of such filing to all other attorneys of record.

Respectfully submitted,

/s/ Richard H. Morgan, Jr.
RICHARD H. MORGAN, JR.

Dated: October 18, 2022